PAGOSA AREA WATER AND SANITA-
TION DISTRICT and San Juan Water
Conservancy District, Applicants–Appel-
lees

v.

TROUT UNLIMITED, Opposer–Appellant

and

Bruce Whitehead, Division Engineer,
Water Division 7, Appellee
Pursuant to C.A.R. 1(e).

No. 06SA338.

Supreme Court of Colorado,
En Banc.

Oct. 22, 2007.
As Modified Nov. 13, 2007.

Collins Cockrel & Cole, Evan D. Ela, Denver, Colorado, Attorneys for Applicants–Appellees.

Trout Unlimited, Andrew Peternell, Boulder, Colorado, Attorney for Opposer–Appellant.

Brownstein Hyatt Farber Schreck, P.C., Steven O. Sims Adam T. DeVoe, John A. Helfrich, Denver, Colorado, Attorneys for Amicus Curiae the City of Aurora.

Hill & Robbins, P.C., David W. Robbins, Dennis M. Montgomery, Jennifer H. Hunt, Denver, Colorado, Attorneys for Amicus Curiae the City of Colorado Springs and the Southwestern Water Conservation District.

City of Denver General Counsel, Patricia L. Wells, Michael L. Walker, Casey S. Funk, Daniel J. Arnold, Denver, Colorado, Attorneys for Amicus Curiae the City and County of Denver acting by and through its Board of Water Commissioners.

Western Resource Advocates, Bart Miller Boulder, Colorado, Attorneys for Amicus Curiae Western Resource Advocates.

Justice HOBBS delivered the Opinion of the Court.

Opposer–Appellant Trout Unlimited appeals a judgment and decree entered by the District Court for Water Division No. 7.[1] The decree confirms for the Pagosa Area Water and Sanitation District ("PAWSD") and San Juan Water Conservancy District ("SJWCD") a conditional water storage right for a planning period extending to the year 2100 for 29,000 acre-feet of water, along with the right to fill and refill the reservoir continuously to achieve a total annual amount of stored water of 64,000 acre-feet, with the right of reuse, utilizing a 100 cubic foot per second ("cfs") diversion. The decree also confirms for the districts a direct flow 80 cfs diversion right independent from the storage right.

Trout Unlimited asserts that the districts did not carry their burden of proving their intent to make a non-speculative conditional appropriation. It argues that the water court should not have adjudicated conditional water rights in amounts premised on demands projected nearly one hundred years into the future. It also argues that the districts intend to sell some of the water to customers outside their boundaries, and that the districts do not have a specific plan and intent for the recreation, fish and wildlife, and aesthetic uses listed in the decree.

In response, the districts contend that the conditional decree does not violate Colorado's anti-speculation doctrine and that their one hundred year planning period, their population projections, their per capita water use figures, and their water demand projections for the one hundred year period are all reasonable.

We hold that a governmental water supply agency has the burden of demonstrating three elements in regard to its intent to make a non-speculative conditional appropriation of unappropriated water: (1) what is a reasonable water supply planning period; (2) what are the substantiated population projec-

---

1. Trout Unlimited presents the following issues for review: (1) whether Applicants have the requisite reasonably anticipated requirement for the decreed amount of water; (2) whether, as a matter of law, Applicants may obtain water rights in amounts premised on growth 100 years into the future; (3) whether Applicants may obtain water rights in amounts premised on hypothetical water availability conditions; (4) whether the evidence established that Applicants have a reasonably anticipated requirement for the decreed amount of water; (5) whether Applicants substantiated their population projections; (6) whether Applicants substantiated their projections of per capita water usage; (7) whether Applicants possess the intent necessary to appropriate water rights in the amounts and for the uses decreed; (8) whether the court should have reduced the decree by the amount of water Applicants intend to sell for use outside their boundaries; and (9) whether the court should have denied claimed water uses for which Applicants did not demonstrate the requisite specific plan and intent.

tions based on a normal rate of growth for that period; and (3) what amount of available unappropriated water is reasonably necessary to serve the reasonably anticipated needs of the governmental agency for the planning period, above its current water supply. In addition, it must show under the "can and will" test that it can and will put the conditionally appropriated water to beneficial use within a reasonable period of time. In the case before us, we determine that the water court has not made sufficient findings of fact enabling our review of its judgment and decree. Accordingly, we set aside the decree, reverse the judgment, and remand this case to the water court for further proceedings. The water court, in its discretion, may take additional evidence and argument as it deems appropriate on remand.

## I.

A water and sanitation district,[2] PAWSD operates a municipal water supply system that currently provides potable water to most of the existing Archuleta County population. It also supplies nearly all of the current commercial water demand of Archuleta County, and provides irrigation water for parks, athletic fields, and golf courses.

In 2005, PAWSD provided approximately 2,000 acre-feet of treated water to the 9,500 people in its service area, plus about 900 acre-feet of raw water for irrigation and related demand. PAWSD currently obtains water from four reservoirs with a total storage capacity of approximately 3,000 acre-feet, as well as two direct diversions from the San Juan River with a total rate of 6.9 cfs.

Local voter approval established the SJWCD[3] in 1987. SJWCD aims to conserve, maximize, and utilize the water resources of the San Juan River and its tributaries for the benefit of property and residents within its boundaries. The SJWCD includes much of Archuleta County, including the Town of Pa-

gosa Springs, and most of the PAWSD service area.

The districts have much in common. There is significant geographic overlap between the districts, but there are also places of exclusive coverage, such as an area known as Aspen Springs that only the SJWCD encompasses. The districts also share leadership, including board members who serve both districts and the PAWSD manager who is on the board of the SJWCD.

The districts have joint meetings to discuss water resource issues several times a year, and they are generally united on their approach to issues. There is an administrative services agreement between the districts, according to which they work together and share services such as accounting, office space, and administrative support. Their overlap is complemented by the fact that they operate under different governmental grants of authority because PAWSD is a water and sanitation district and SJWCD is a water conservancy district. SJWCD defers to PAWSD in the arena of water and sewer service and does not plan to operate the facilities.

The SJWCD currently holds a conditional decree for water diversion from the San Juan River and storage of 6,300 acre-feet of water for the proposed Dry Gulch Reservoir, an off-stream reservoir to be constructed approximately one and one-half miles above the town of Pagosa Springs towards Wolf Creek Pass. In 2002, the water court issued to the SJWCD a diligence decree for 6,300 acre-feet of water, conditional, for domestic, municipal, industrial, recreation, and piscatorial purposes with an appropriation date of July 22, 1967. In 2004, the two districts passed a resolution to make an additional conditional appropriation for the Dry Gulch Reservoir. The districts' engineer, Steve Harris, had prepared and submitted a 2003 report to the board of directors of both districts that documented a water storage need of approximately 12,000 acre-feet in the Dry Gulch Reser-

---

**2.** Colorado water and sanitation districts exist under the provisions of the Special District Act, sections 32–1–101 to –547, C.R.S. (2007). They are quasi-municipal corporations and political subdivisions that supply water for domestic and other public and private purposes and have, among other powers, the authority to construct, operate, and maintain reservoirs, treatment works, and facilities, incident thereto. §§ 32–1–103(20), –103(24 & 25); 32–1–1006, C.R.S. (2007).

**3.** A water conservancy district exists under the Water Conservancy Act, sections 37–45–101–153,

voir to meet the 2040 annual demand of the districts' users.

Harris's testimony at trial in the water court includes the following statement about the year 2040 Dry Gulch storage need and diversion rate to meet the districts' projected demand.

> Okay. Also in this report [the 2003 Harris report] we looked at several different places to have direct diversions out of the river and several different options for reservoir storage. And out of that I concluded or recommended that the Dry Gulch pump station would be the best location for the 18 and a half additional cfs that's needed....
> * * *
> Yes, There are eight storage alternatives: two sizes of Dry Gulch Reservoir, a 4,000 acre-foot and a Dry Gulch Reservoir at 12,000 acre-foot, Stevens Enlargement, the West Fork Reservoir, Turkey Creek Reservoir—that was an old reservoir studied by the town back in the '80s by Western Engineers—and the Martinez Reservoir, which is up in the neighborhood of Hatcher, up in the Stollsteimer Basin, and the East Fork Reservoir, which at that time there were some water rights and that one's probably not an option any longer. And of those, either—Dry Gulch Reservoir was the least expensive at any size of those options.

As Harris and the districts' legal counsel turned to preparing the 2004 water court application in this case, Harris recommended that the districts apply for conditional water rights sufficient to fill the Dry Gulch Reservoir to the maximum possible size this off-channel location would provide. His rationale for applying for a year 2100 supply of water, rather than the 2040 supply set forth in his 2003 report to the districts, considers the possibility of other uses being made in the future of the San Juan River water.

> This recommending 35,000 acre-feet for the water rights application was, to me, a no-brainer, cause you go to the site capaci-

ty and you do your darndest to get that amount built....
* * *
[The] town of Pagosa Springs is looking at a recreation in-channel diversion, much like what Durango has already applied for. That would essentially tie up a good portion of the river and if you don't get in ahead of it, you're essentially not going to have hardly any water left to use.

Harris was also concerned that the Colorado Water Conservation Board's instream flow water right on the San Juan River of 30 cfs in the winter and 50 cfs in the summer might be increased sometime in the future through an additional appropriation, or that the United States Forest Service might impose a right-of-way permit condition requiring a large amount of bypass flow.

The application was initially opposed by three parties[4] that eventually stipulated to the districts' proposed decree. The application was also opposed by Trout Unlimited, a non-profit fisheries conservation organization. Trout Unlimited filed a statement of opposition and participated in the trial.

In its trial brief, Trout Unlimited explained that while it "appreciate[d] the Districts' need to secure water rights to serve future municipal growth," it believed that the application was flawed because the proposed appropriation would give the districts more water than they could reasonably anticipate using over a reasonable period of time, in contradiction to Colorado's anti-speculation doctrine.

In contesting the districts' population projections, Trout Unlimited introduced into evidence a study from the National Research Council's Committee on Population that cautions against making population projections for long time periods. "[P]opulation forecasts should not be made over longer horizons than thirty years or so, due to the rapid increase in uncertainty of forecasts beyond

C.R.S. (2007). Its authority includes appropriation and acquisition of water and water rights. § 37–45–118(1)(j), C.R.S. (2007).

4. The three opposing parties that eventually stipulated include the Park Ditch Company, which

was concerned over how the Dry Gulch project would impact Park Ditch's traditional flow and usage; Koinonia, LLC, another appropriator of San Juan River water; and the Weber Entities, a group representing the owners of land where the Dry Creek Gulch would be located.

this point." *Beyond Six Billion: Forecasting the World's Population* 189–90 (John Bongaarts & Rodolfo A. Bulato eds., 2000).

Trout Unlimited's engineer, John Gerstle, used the same spreadsheet model that Harris used for calculating future water demand, in order to demonstrate how excessive the districts' projections were. He substituted what he thought were more realistic model inputs, such as existing direct diversions available to the districts, revised growth projections based on Colorado State Demography Office estimates, per capita water requirements taking conservation measures into account, and storage and diversion needs for different time periods, including 2050 projections. His conclusion was that the districts' claim exceeds their actual need.

After taking evidence, the water court decreed additional conditional rights (above the 6,300 acre-feet previously decreed for the Dry Gulch Reservoir) that gave the districts essentially all they had asked for in their application. It entered a conditional decree for a wide variety of municipal, commercial, irrigation, and recreational uses, accompanied by reuse of the water, in the following amounts:

18. The Districts are hereby decreed a conditional water storage right for Dry Gulch Reservoir confirming the right to storage in the amount of 29,000 acre-feet, along with the right to fill and refill continuously to achieve a total annual storage volume of 64,000 acre-feet by capture of inflow tributary to the reservoir and by diversion from the San Juan River via the Dry Gulch Pumping Station and Park Ditch points of diversion, together at a combined rate not to exceed 100 cfs ... with a priority established by the appropriation date of December 20, 2004.

19. The Districts are hereby decreed an additional conditional water right for the Dry Gulch Pumping Station confirming the right to divert water from the San Juan River for direct flow purposes and/or for storage in reservoirs owned or controlled by the Districts, including trans-basin use and storage in District 78 (Piedra River watershed), at a rate of up to 80.0 cfs ... with a priority established by the appropriation date of December 20, 2004.
* * *

24. Return flows from water derived from the Subject Water Rights and returned to the San Juan River shall be reusable by the Districts using any available means that can be properly accounted for. In addition, the Districts, or either of them, may devise and employ an augmentation and/or exchange plan that relies on the reuse of the water appropriated herein. Prior to reusing any portion of the water appropriated herein, the Districts, or either of them, shall obtain water court approval of an augmentation plan and/or appropriative rights of exchange that incorporate the reuse of such water and that provides a specific plan for the quantification, accounting, control and administration of the reuse of such water.

The decree provides that the "[d]istricts may exercise the storage or direct flow rights independently or in any combination," with the limitation that the diversion rate "shall never exceed 180 cfs at any given time."

In regard to Colorado's anti-speculation and "can and will" standards for issuance of a conditional decree, the court entered the following conclusions of law:

15. The Districts have properly initiated the appropriation of the Subject Water Rights as of December 20, 2004, have proceeded with reasonable diligence in the development of the Subject Water Rights from the date of initiation, have demonstrated that water can and will be diverted and beneficially used, and that completion of the appropriations can be accomplished with diligence and within a reasonable time, and therefore the Districts are entitled to a decree confirming and approving the Subject Water Rights within the meaning of §§ 37–92–103(3)(a) and 37–92–305, C.R.S. The Districts' intent to beneficially use the Subject Water Rights is nonspeculative and based upon its reasonable needs for a growing population.

On a number of grounds, appellant Trout Unlimited asserts on appeal that the judgment and decree in this case allows the districts to speculate in the public's water resource in violation of the applicable Colorado legal standards.

In light of the absence of water court findings of fact on the elements concerning a governmental agency's non-speculative intent to appropriate and the "can and will" test, we reverse the water court's judgment.

## II.

We hold that a governmental water supply agency has the burden of demonstrating three elements in regard to its intent to make a non-speculative conditional appropriation of unappropriated water: (1) what is a reasonable water supply planning period; (2) what are the substantiated population projections based on a normal rate of growth for that period; and (3) what amount of available unappropriated water is reasonably necessary to serve the reasonably anticipated needs of the governmental agency for the planning period, above its current water supply. In addition, it must show under the "can and will" test that it can and will put the conditionally appropriated water to beneficial use within a reasonable period of time. In the case before us, we determine that the water court has not made sufficient findings of fact enabling our review of its judgment and decree. Accordingly, we set aside the decree, reverse the judgment, and remand this case to the water court for further proceedings. The water court, in its discretion, may take additional evidence and argument as it deems appropriate on remand.

### A.

#### Standard of Review

Whether an applicant has met the legal standards for a conditional appropriation presents mixed questions of fact and law that we review de novo. *City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 40 (Colo. 1996); *Bd. of County Comm'rs. v. Upper Gunnison River Water Conservancy Dist.*, 838 P.2d 840, 847 (Colo.1992). We defer to the water court's findings of fact if the evidence supports them. *Bijou*, 926 P.2d at 40.

### B.

#### Anti–Speculation and Beneficial Use

Water is a public resource. The water of every natural stream, including tributary groundwater, is the property of the public, subject to appropriation.[5] Colo. Const. art. XVI, § 5. Thus, surface and tributary groundwater is dedicated by Colorado's constitution and statutes to appropriation for beneficial use by public agencies and private persons in order of their adjudicated priorities. *High Plains A & M, LLC v. Se. Colo. Water Conservancy Dist.*, 120 P.3d 710, 718 (Colo.2005).

Colorado's system of public ownership of water, combined with the creation of public and private use rights therein by appropriation, circumscribes monopolist pitfalls. When the beneficial use requirement was put into practice in the nineteenth century, its fundamental purpose was to establish the means for making the public's water resource available to those who had the actual need for water, in order to curb speculative hoarding. David B. Schorr, *Appropriation as Agrarianism: Distributive Justice in the Creation of Property Rights*, 33 Ecol. L.Q. 3, 9, 22 (2005).

Colorado water law continues to fill this role today, through its requirements for optimum beneficial use, efficient water management, and priority administration. *Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1146–47 (Colo.2001).

The public's water resource is subject to maximum utilization, a doctrine intended to make water available for as many decreed uses as there is available supply. § 37–92–102(1)(a), C.R.S. (2007); *Farmers Reservoir & Irrigation Co. v. City of Golden*, 44 P.3d 241, 245 (Colo.2002); *see also* § 37–92–501(2)(e), C.R.S.(2007). Within the priority system, maximum utilization spreads the benefit of the public's water resources to as many uses as possible, within the limits of the physically available water supply, the constraints of interstate water compacts, and

5. Author David B. Schorr discusses the anti-speculation basis for public ownership of water and the creation of public and private use rights therein recognized by the Colorado Constitution. With ownership of the state's water vested in the people, private actors could acquire only the right to use that water, and then only under conditions stipulated by the owner through its agent, the state. This notion of public ownership provided the theoretical basis for much of the law developed to counter water companies and speculators in Colorado. David B. Schorr, *The First Water–Privatization Debate: Colorado Water Corporations in the Gilded Age*, 33 Ecol. L.Q. 313, 319–20 (2006).

the requirements of United States Supreme Court equitable apportionment decrees.

■ In turn, the objective of maximum use administration, under the prior appropriation system, is to achieve "optimum use" in every appropriator's utilization of the water. § 37–92–501(2)(e) ("[A]ll rules and regulations shall have as their objective the optimum use of water consistent with preservation of the priority system of water rights."). Maximum utilization does not mean that every ounce of Colorado's natural stream water ought to be appropriated; optimum use can be achieved only through proper regard for all significant factors, including environmental and economic concerns. *See Alamosa–La Jara Water Users Prot. Ass'n v. Gould,* 674 P.2d 914, 935 (Colo.1983).

■ Neither a private nor a governmental agency may obtain a right to use a portion of the public's water resource unless it establishes intent to make a non-speculative appropriation. *See Vought v. Stucker Mesa Domestic Pipeline Co.,* 76 P.3d 906, 912 (Colo.2003). Once an appropriator makes an actual beneficial use, it holds a vested property right of use protected by constitutional guarantees. *Empire Lodge,* 39 P.3d at 1147; *Strickler v. City of Colo. Springs,* 16 Colo. 61, 70, 26 P. 313, 316 (1891).

Colorado's system for decreeing conditional appropriations encourages beneficial use by antedating the priority of a water right, but only to the extent of the actual beneficial use that subsequently occurs. *Dallas Creek Water Co. v. Huey,* 933 P.2d 27, 35 (Colo. 1997). This makes public and private projects possible by giving appropriators the time and certainty necessary to obtain and complete engineering, financing, and construction of the necessary works for capturing, possessing, and controlling water for beneficial use in the completion of an appro-

priation. *Public Serv. Co. of Colo. v. Blue River Irrigation Co.,* 753 P.2d 737, 739 (Colo. 1988).

■ A conditional water right is "a right to perfect a water right with a certain priority upon the completion with reasonable diligence of the appropriation upon which such water right is to be based." § 37–92–103(6). To obtain a conditional water right, an applicant must demonstrate that: (1) it has taken a "first step," which includes an intent to appropriate the water and an overt act manifesting such intent; (2) its intent is not based on a speculative sale or transfer of the water to be appropriated; and (3) there is a substantial probability that the applicant can and will complete the appropriation with diligence and within a reasonable time. *Bijou,* 926 P.2d at 31.

■ For an applicant to satisfy the first step, he or she must meet the burden of demonstrating intent to appropriate the water for beneficial use. *Id.* at 36; *City of Aspen v. Colo. River Water Conservation Dist.,* 696 P.2d 758, 761 (Colo.1985). This requirement is the basis of the anti-speculation doctrine. *See Bijou,* 926 P.2d at 37.[6]

■ For a private entity to meet its intent burden, it must have contractual commitments for any appropriations that are not planned for its own use, or the application will fail as unduly speculative. *Colo. River Water Conservation Dist. v. Vidler Tunnel Water Co.,* 197 Colo. 413, 415–16, 594 P.2d 566, 568–69 (1979). On the other hand, a governmental water supply agency has a unique need for planning flexibility because it must plan for the reasonably anticipated water needs of its populace, taking into account a normal increase in population. *City & County of Denver v. N. Colo. Water Conservancy Dist.,* 130 Colo. 375, 384, 276 P.2d 992,

6. Our opinion in *Bijou* provides an overview of the common law and legislative development of the anti-speculation doctrine. 926 P.2d at 36–40. In 1979, the General Assembly modified the definition of appropriation found in the Water Right Determination and Administration Act of 1969. This legislation endorsed the *Vidler* intent requirement for private entities that we announced in *Colorado River Water Conservation District v. Vidler Tunnel Water Co.,* 197 Colo. 413,

594 P.2d 566 (1979). The legislation also recognized the need for a more flexible anti-speculation requirement that would allow government agencies planning flexibility, the "great and growing cities" concept that we had earlier recognized in *City & County of Denver v. Sheriff,* 105 Colo. 193, 96 P.2d 836 (1939), and *City & County of Denver v. Northern Colorado Water Conservancy District,* 130 Colo. 375, 276 P.2d 992 (1954).

997 (1954); *City & County of Denver v. Sheriff,* 105 Colo. 193, 202, 96 P.2d 836, 841 (1939).

Thus, Colorado's 1969 Act defines "appropriation" in a manner that differentiates private appropriators from governmental agency appropriators. Section 37–92–103 states:

(3)(a) "Appropriation" means the application of a specified portion of the waters of the state to a beneficial use pursuant to the procedures prescribed by law; *but no appropriation of water, either absolute or conditional, shall be held to occur when the proposed appropriation is based upon the speculative sale or transfer of the appropriative rights to persons not parties to the proposed appropriation, as evidenced by either of the following:*

(I) The purported appropriator of record does not have either a legally vested interest or a reasonable expectation of procuring such interest in the lands or facilities to be served by such appropriation, *unless such appropriator is a governmental agency or an agent in fact for the persons proposed to be benefited by such appropriation.*

(II) *The purported appropriator of record does not have a specific plan and intent to divert, store, or otherwise capture, possess, and control a specific quantity of water for specific beneficial uses.*

(emphasis added).

■ As we explained in *Bijou,* the statute excuses governmental agencies from the requirement to have a legally vested interest in the lands or facilities served, but the exception "does not completely immunize municipal applicants from speculation challenges." 926 P.2d at 38. A governmental agency need not be certain of its future water needs; it may conditionally appropriate water to satisfy a projected normal increase in population within a reasonable planning period.

■ The governmental agency does not have carte blanche to appropriate water for speculative purposes; in effect, the statute provides for a limited exception from certain requirements otherwise applicable to private appropriators. Public agencies must still substantiate a non-speculative intent to appropriate unappropriated water, and they must "have a specific plan and intent to divert, store, or otherwise capture, possess, and control a specific quantity of water for specific beneficial uses." § 37–92–103(3)(a)(II). Accordingly, the governmental agency has the burden to demonstrate that its conditional appropriation is not speculative. *Bijou,* 926 P.2d at 39.

■ The conditional appropriation must be consistent with the governmental agency's reasonably anticipated water requirements based on substantiated projections of future growth within its service area.

Thus, under section 37–92–103(3)(a), a municipality may be decreed conditional water rights based solely on its projected future needs, and without firm contractual commitments or agency relationships, *but a municipality's entitlement to such a decree is subject to the water court's determination that the amount conditionally appropriated is consistent with the municipality's reasonably anticipated requirements based on substantiated projections of future growth.*

*Id.* (emphasis added). The conditional appropriation must not be based on a conjectural population projection that becomes a self-fulfilling prophecy of growth.

Most front range municipalities in Colorado could conjecture growth in the next few decades at exponential rates. To some extent, that growth is directly related to the ability of the municipality to supply water. Hence, the projection becomes a self-fulfilling prophecy if the municipality secures a right to the water necessary to sustain the growth. We do not view such conjecture as sufficient substantiation to support a conditional decree for water. Municipalities must do more than represent to the water court that if they had water, they would be able to grow.

*Id.* at 39 n. 25.

Only a reasonable planning period for the conditional appropriation is allowed. In *Bijou,* the water court's findings of fact addressed what constitutes a reasonable water supply planning period, fifty years in that

case, and found the existence of substantiated population and water use projections. *Id.* at 42. The judgment and decree we upheld also included sufficient "reality checks" for the purpose of ensuring in subsequent diligence proceedings that the appropriator will utilize the "newly appropriated rights for its own purposes and does not become a permanent lessor or wholesaler of water yielded by these rights." Id. at 50 n. 40.

We also determined in *Bijou* that use of a volumetric limitation in a conditional decree, rather than a flow rate standard, curbs the otherwise speculative tendency of a lengthy conditional appropriation period. *Id.*

Requiring adjusted, realistic estimates of future need in subsequent diligence proceedings is consistent with the purpose underlying both the anti-speculation doctrine and the diligence requirement, i.e., preserving unappropriated water for future users having legitimate, documented needs. *Id.* at 51.[7]

In addition to demonstrating non-speculative intent, a governmental agency must satisfy the "can and will" requirement in order to obtain a conditional decree. Section 37–92–305(9)(b) provides:

No claim for a conditional water right may be recognized or a decree therefor granted except to the extent that it is established that the waters can and will be diverted, stored, or otherwise captured, possessed, and controlled and will be beneficially used and that the project can and will be completed with diligence and within a reasonable time.

■ The anti-speculation and the "can and will" requirements are closely related. A conditional decree applicant cannot reasonably prove that its project can and will be completed with diligence and within a reasonable time if it lacks the requisite non-speculative intent. *City of Black Hawk v.*

*City of Central,* 97 P.3d 951, 956–57 (Colo. 2004).

■ The factors a court considers under the "can and will" requirement in diligence proceedings include, but are not limited to: 1) economic feasibility; 2) status of requisite permit applications and other required governmental approvals; 3) expenditures made to develop the appropriation; 4) ongoing conduct of engineering and environmental studies; 5) design and construction of facilities; and 6) nature and extent of land holdings and contracts demonstrating the water demand and beneficial uses which the conditional right is to serve when perfected. *See Dallas Creek,* 933 P.2d at 36. The purpose of the diligence proceeding is to gauge whether the conditional appropriator is making steady progress in putting the water to beneficial use with diligence and within a reasonable period of time. *Id.*

The reason for continued scrutiny of the conditional appropriation through diligence proceedings is to prevent the hoarding of priorities to the detriment of those seeking to use the water beneficially. *Id.* The effect of a long-term conditional right is to preclude other appropriators from securing an antedated priority that will justify their investment. *See generally Natural Energy Res. Co. v. Upper Gunnison River Water Conservancy Dist.,* 142 P.3d 1265, 1277 (Colo.2006).

Those in line behind a conditional appropriation for a long planning period risk losing any investment they may make in the hope that the prior conditional appropriation will fail. They also may not be able to raise the necessary funds in the first instance that will enable them to proceed, in light of their subordinated status. Those who obtain a priority date junior to the antedated priority and proceed to put the water to beneficial use must involve themselves in a continued expensive struggle throughout numerous six

7. Among governmental agencies, a water conservancy district has no authority to sell water outside of its boundaries. § 37–45–118(IV)(j), C.R.S. (2007) ("[T]he sale, leasing, and delivery of water ... whether the water is developed by the principal district or a subdistrict thereof, shall only be made for use within the boundaries."). Other municipal and quasi-municipal agencies may be able to sell to customers outside of their boundaries. *City & County of Denver v. Colo. River Water Conservation Dist.,* 696 P.2d 730, 742 (Colo.1985) (holding that Denver could appropriate water for the purpose of extraterritorial leasing); *but see Bijou,* 926 P.2d at 40 (stating that in such an instance the governmental agency is acting on the open market and is

year diligence periods to knock out all or part of the antedated conditional appropriation, in order to protect their appropriations. The General Assembly's intent is to prevent decreed conditional appropriations from accumulating to the detriment of those whose priority will be advanced by cancellation of the senior conditional priority in whole or part, or those who might proceed to initiate a new or enlarged appropriation. *Dallas Creek*, 933 P.2d at 37–38, 42.

 Thus, in the design of water law, the essential function of the water court in a conditional decree proceeding is to determine the amount of available water for which the applicant has established both a need and a future intent and ability to actually use. *Bijou*, 926 P.2d at 47. As a prerequisite, the applicant has the burden of demonstrating a nonspeculative intent to put the water to beneficial use and, under the "can and will" test, a substantial probability that its intended appropriation will reach fruition. *Id.* at 42.

### C.

### Lack of Sufficient Trial Court Findings

The case before us involving a one hundred year planning horizon requires us to determine whether the governmental agency exception to the otherwise applicable anti-speculation requirements should be broadly or narrowly construed. We determine that our decision in *Bijou* stands for a narrow construction.

As *Bijou* demonstrates, Colorado's anti-speculation doctrine includes constraints on conditional appropriations by governmental agencies.[8] The length of the governmental agency's water supply planning period, its anticipated future needs for a normal rate of population growth based on substantiated population projections for that period, the amount of conditionally-decreed water to be

allocated for its use, and its ability under the "can and will" test to put the conditionally appropriated water to beneficial use within a reasonable planning period were the focus of our factual and legal inquiry into the water court's judgment and decree in *Bijou*. *Id.* at 37–45.

In upholding the water court's approval of a fifty year water supply planning horizon for the conditional appropriation, we observed that the applicant had "presented extensive evidence to support both its projections of future water demand and its ultimate intent." *Id.* at 40. That evidence included witnesses, planning experts, planning documents, and studies prepared by water consultants. *Id.* In addition, the water court imposed "reality checks" in the conditional decree to verify in subsequent six year diligence proceedings that the population and water usage forecasts continued to be reasonable. *Id.* Also, we approved the inclusion of a decree provision for a volumetric limit on the conditional appropriation. *Id.*

 Based on Colorado's statutory requirements and *Bijou*, the limited governmental agency exception to the anti-speculation doctrine should be construed narrowly, in order to meet the state's maximum utilization and optimum beneficial use goals. Although the fifty year planning period we approved in *Bijou* is not a fixed upper limit, and each case depends on its own facts, the water court should closely scrutinize a governmental agency's claim for a planning period that exceeds fifty years.

The ultimate factual and legal issue in a governmental agency conditional appropriation case involves how much water should be conditionally decreed to the applicant. The experts who testified at the water court trial in this case were called upon to address such pertinent factors as: (1) implementation of reasonable water conservation measures for the planning period;[9] (2) reasonably expect-

---

bound by the anti-speculation standards applicable to private appropriators).

8. The limited governmental entity water supply exception to the anti-speculation law, often called "the great and growing cities" doctrine, has been criticized for allowing public agencies to do just what private entities cannot do, i.e., speculate in the public's water resource. *See*

Dan Tarlock & Sarah Bates Van de Wetering, *Water and Western Growth*, Water Report, Sept. 15, 2007, at 1, 1–13.

9. "Water conservation" is defined as "water use efficiency, wise water use, water transmission and distribution system efficiency, and supply substitution. The objective of water conservation is a long-term increase in the productive use of

ed land use mixes during that period; (3) reasonably attainable per capita usage projections for indoor and outdoor use based on the land use mixes for that period; and (4) the amount of consumptive use reasonably necessary for use through the conditional appropriation to serve the increased population.[10]

■■ But in this case, the water court did not make sufficient findings of fact enabling our review of its judgment and decree. For the water court's guidance and consistent with the statutes and *Bijou*, we identify areas of unresolved factual findings bearing on whether the districts have met their burden to demonstrate a nonspeculative intent to appropriate the amount of water they claim and whether the districts' have satisfied the "can and will" test. In doing so, we do not limit the water court's authority to: (1) consider additional factors based on the issues raised by the parties; (2) make findings based on the evidence already contained in the record and that which it takes on remand; and (3) enter a judgment and decree for the districts' conditional appropriation.

In decreeing to the districts a total diversion into storage of 64,000 acre-feet of water annually, with a right of reuse, and decreeing a separate 80 cfs direct flow diversion, the water court did not make findings of fact with regard to the disputed threshold issue of what planning period is reasonable, whether 2040, 2050, or 2100.

When the districts were forming their intent to appropriate water, they started with a planning horizon that was well within the fifty year planning horizon approved in *Bijou*. They had before them the 2003 Harris report that supported a conditional appropriation to meet their 2040 demands. Because SJWCD already holds a 6,300 acre-foot conditional water right, the Harris report supported a year 2040 need for the appropriation of an additional 5,700 acre-feet of water for a total of 12,000 acre-feet of water at a diversion rate of 18.5 cfs through the Dry Gulch Pump Station into the reservoir.

In contrast, the conditional decree approved by the water court contains a planning horizon, diversion rates, and a total volumetric annual consumption amount for stored water far in excess of what the districts initially considered to be reasonable for water supply planning purposes. The decree also contains an unexplained direct flow diversion rate of 80 cfs. The decree implements the districts' goal of appropriating water for the entire 35,000 acre-foot storage capacity of the Dry Gulch site, with a right to refill and make a fully consumptive reuse, based on population and water demand protections for the year 2100 put forth by their engineer.[11]

In approving the districts' conditional decree application, unlike the water court in *Bijou*, the water court did not resolve a factual dispute concerning substantiated projections of future growth. Trout Unlimited advanced population projections for Archule-

---

water supply in order to satisfy water supply needs without compromising desired water services." § 37–60–126(g), C.R.S. (2007).

10. Typically, a governmental agency utilizes the services of a water resources engineer to help assess the future water supply needs for its service area, above that which is available through use of its present supply. *See* Daniel S. Young & Duane D. Helton, *Developing A Water Supply In Colorado: The Role Of An Engineer*, 3 U. Denv. Water L.Rev., 373–390 (2000). The amount of water required to meet a public water supply agency's reasonably anticipated needs is based on a substantiated rate of normal population growth, and depends on estimating the amount of water that will be physically consumed by the agency's water users within a pre-determined planning horizon. *Id.* at 377.

11. The districts' concern in pursuing such a long water supply planning horizon was that the Colorado Water Conservation Board might make an additional instream flow appropriation under its statutory authority, section 37–92–102(3), C.R.S. (2007), or that a recreational in-channel diversion water right might be decreed to the Town of Pagosa Springs under its statutory authority, section 37–92–103(10.3), downstream of the districts' diversion point on the San Juan River, or both. The districts also conjectured that the U.S. Forest Service might require a significant bypass flow as a condition for federal permitting for the Dry Gulch Reservoir project. Such considerations do not fit into the applicable requirement to address water availability based on the conditions of the stream as they exist by reason of the exercise of prior-appropriated rights. *See Matter of Bd. of County Comm'rs of County of Arapahoe*, 891 P.2d at 971.

ta County based on figures from the State Demographer's Office and the districts' engineer made his own long-term projections based on recent growth rates in the county. Nor did the water court make findings concerning the future land use mixes for the Town of Pagosa Springs and Archuleta County and per capita water usage requirements, taking into account implementation of water conservation measures.[12] Further, the water court did not take into account the measure of consumptive use the districts reasonably need to serve their population in the future during a reasonable planning period.

The effect of decreeing reuse rights is to greatly increase an entity's usable water supply. As we pointed out in *Bijou*, an appropriation of native water is typically subject to only one use, with the return flows going back to the groundwater or surface water. 926 P.2d at 27–28. Return flows help fill other appropriations, whereas a right of reuse to extinction does not. We said in *Bijou* that one can appropriate reuse rights of unappropriated native flow water, but the need to do so must be substantiated. *Id.* Here, the water court did not make findings of fact relating to the amount of water that can be generated through reuse, in relationship to the total amount of available unappropriated water necessary to meet the districts' reasonably anticipated needs over a reasonable water supply planning period. *Id.* at 39–40.

Finally, the water court did not make findings of fact under the "can and will" test regarding the districts' ability to construct the 35,000 acre-foot reservoir and perfect the use and reuse of 64,000 acre-feet of stored water together with construction and use of a separate 80 cfs direct flow water right.

In sum, the planning horizon for the conditional appropriation the water court decreed doubles the fifty year period for the condi-

tional appropriation the water court decreed in *Bijou,* and the amount of consumptive use water the water court decreed greatly exceeds the amount the 2003 Harris report supports as adequate to meet a 2040 planning horizon. The justification for the much longer planning horizon and the vastly greater amount of water conditionally decreed for the districts' consumption does not appear in the water court's findings of fact, judgment, and decree.

### D.

### Recreation, Fish, and Wildlife Uses

Trout Unlimited also contends that the districts failed to demonstrate the requisite specific plan and intent for a number of the uses listed in the decree, specifically recreation, fish and wildlife, and aesthetic purposes. The decree provides that water appropriated by the districts could be used for "recreation (including releases to benefit decreed recreational in-channel rights), piscatorial and wildlife preservation ... and aesthetic purposes." Recreational use of stored water in and on a reservoir is a recognized and frequent beneficial use in this state. § 37–92–103(4), (C.R.S.2007).

The districts satisfied the intent requirement for these uses to be confirmed in the conditional decree for recreation in and on Dry Gulch Reservoir. During the water court proceedings, PAWSD board member Karen Wessels testified that the reservoir would be useful for recreation and the districts were actively seeking to make recreational, wildlife and fish, and aesthetic uses of the stored waters. The districts' pursuit of facilities and agreements for such purposes in association with the Dry Gulch Reservoir can be evaluated in future diligence proceedings.[13]

---

12. Assessing a reasonable projection of the mixture of uses and their consumptive measures will yield monthly and annual consumptive use figures for the water applied to beneficial use. *Upper Eagle Reg'l Water Auth. v. Simpson*, 167 P.3d 729, 734–736 (Colo.2007). The conservation measures in the PAWSD plan include water efficient fixtures, low water landscapes, water rate structures, education, and regulatory measures such as plumbing codes. Pagosa Area Water &

Sanitation Dist., *Water Conservation and Drought Management Plan* 9 (2004), *available at* http://www.pd–go.com/files/upload–3649.pdf.

13. The record does not identify a stream segment or the amount of water to be released downstream for augmentation of fish and recreational uses or recreational in-channel diversion use in compliance with the applicable requirements. Thus, the districts have not demonstrated their

## E.

## Conclusion

In accordance with the applicable statutory and case law requirements identified in this opinion, the water court should examine the evidence utilizing the elements applicable to determining whether the districts have met their burden for a non-speculative conditional appropriation, accompany its judgment with sufficient findings of fact based on the evidence, and fashion appropriate decree provisions, which may include "reality checks" and volumetric limitation provisions for the districts' conditional appropriation. The water court must also make factual findings concerning whether the districts can and will place the claimed amount of unappropriated water to beneficial use within a reasonable time.

## III.

Accordingly, we reverse the water court's judgment, set aside the conditional decree, and remand this case for further proceedings consistent with this opinion. The water court, in its discretion, may take additional evidence and argument as it deems appropriate on remand.

Justice COATS concurs in the judgment only.

Justice EID specially concurs, and Justice RICE joins in the special concurrence.

Justice COATS, concurring in the judgment only.

While I agree that the judgment of the water court must be reversed and its conditional decree vacated, I do not agree with the majority's rationale for doing so or its remand order. In my view, the water court's error lies less in the inadequacy of its findings than in its failure to distinguish the reasonable time requirement of the "can and will" test from the reasonableness of a municipality's growth projections for purposes of the anti-speculation doctrine. Although the majority acknowledges, at least in princi-

ple, the independence of the "can and will" standard, I fear that its explanation for reversing the judgment in this case can only perpetuate a fundamental misreading of *Bijou* and encourage governmental agencies and water courts alike to tie up the state's water resources with conditional decrees long beyond the time reasonably required to complete a particular project and actually put the resulting water to a beneficial use.

In *City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 38–39 (Colo.1996), we clarified the scope of the governmental agency exception to the anti-speculation doctrine, holding that a municipality may be decreed conditional water rights without firm contractual commitments or agency relationships, but only to the extent of its reasonably anticipated requirements, based on substantiated projections of future growth. We also acknowledged the anti-speculation objective of the "can and will" statute and held that where speculation is not a real concern, the "can and will" test should not be applied to prevent on technical grounds an appropriation that would serve the goal of maximum utilization. *Id.* at 43 n. 31; *see also Bd. of County Comm'rs of Arapahoe County v. United States, et al.*, 891 P.2d 952, 962 (Colo. 1995). We nevertheless drew a clear distinction between the "can and will" standard and the anti-speculation doctrine and validated, even for governments, the separate "can and will" requirement that an applicant for a conditional water right establish a substantial probability that *within a reasonable time* the facilities necessary to effect the appropriation can and will be completed with diligence and the resulting waters applied to a beneficial use. *Bijou*, 926 P.2d at 42–43.

Perhaps because the applicant's satisfaction of the "can and will" test was challenged only as to various legal contingencies and the capacity of its proposed facilities, we did not more specifically address the "can and will" test's reasonable time requirement. By the same token, however, we clearly did not excuse municipalities from complying with it or equate it with a municipality's reasonable

intent to appropriate a specified amount of water to effectuate such uses. *See Bd. of County Comm'rs of the County of Arapahoe v. Upper*

*Gunnison River Water Conservancy Dist.*, 838 P.2d 840, 849 (Colo.1992); §§ 37–92–103(10.3), 37–92–305(13)(a),(C.R.S.2007).

population projections. In context, we implicitly found it satisfied in *Bijou* only because of the complex circumstances surrounding the decree in that case.

In particular, we took pains to note that Thornton already served a population of 78,000 and that in addition to expected steady and substantial growth, the city's location downstream from other municipal and industrial users was resulting in a gradual deterioration of its water quality. *Id.* at 19. Its "Northern Project," which was the subject of the conditional decree, involved a complex interrelationship of water acquisition and distribution methods, including diversion, exchange, storage, augmentation, and physical transportation. *Id.* at 20. From an engineering perspective it required the utilization of a wide variety of structures and facilities, to be constructed incrementally, in carefully integrated phases, requiring some thirty to forty years for full implementation. *Id.* at 20–21. Legally, it involved four separate water right applications with statements of opposition by forty-nine parties, which had already involved some ten years of litigation by the time of our judgment. *Id.* at 21–22. We described the project as one of the largest municipal water projects to come before this court in recent memory. *Id.* at 19.

By contrast, virtually none of these complexities was present in the instant decree. By comparison with Thornton's Northern Project in *Bijou*, the population, engineering, and legal challenges faced by the applicants in this case seem almost trivial. As the testimony of its expert made clear, the application for a conditional decree of water rights that would not be needed, even by the applicant's projections, for nearly a century was not dictated in any way by the complexities of developing the water and making it available for use, but rather as a bid to preempt intervening appropriations for more immediate needs. On its face, such a practice is antithetical to the principle of maximum utilization in general, and the "can and will" statute in particular.

Once all connection between the time needed to diligently develop a project for the beneficial utilization of water and a conditional decree for the right to use it has been severed, the fundamental justification for relating priorities back to a time predating actual appropriation is no longer applicable. The right of municipalities to lay claim to available waters for future needs (before their neighbors can do so) becomes limited only by their ability to reasonably predict population growth. Recognizing the open-endedness of such a rule, the majority, virtually without any serious attempt at justification, purports to presumptively limit conditional decrees to the time frame approved in *Bijou*. While the danger foreseen by the majority is real enough, I believe the solution rests in the continued vitality of the reasonable time requirement of the "can and will" test, even for governmental agencies.

Rather than imposing an arbitrary presumption about what is not (and apparently what is) a reasonable period for municipal conditional decrees, this court need only make clear that the "can and will" statute requires completion within a reasonable time, in light of the legal, engineering, and economic circumstances of the project. Nothing in the anti-speculation exception for governmental agencies relieves municipalities of this additional requirement, excepting only that the anticipation of reasonable growth by municipalities is not considered speculation by the statute at all, and therefore municipal projects that would serve the goal of maximum utilization should not be thwarted by the "can and will" standard on technical grounds.

Because I believe the record in this case adequately demonstrates that the applicant failed to meet its burden under the "can and will" standard, and that remanding for further findings as the majority does will prove misleading about the actual requirements of that standard to both lower courts and concerned parties, I would simply reverse the judgment of the water court.

Justice EID, specially concurring.

The water court concluded that the conditional decree in this case was non-speculative and met the "can and will" requirement, but did not make findings to support its conclusions. Maj. op. at 310. In my view, we should simply remand the case to the water

court to make such findings. Because the majority goes beyond a simple remand—instead giving a "narrow construction" to our governing precedent of *City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1 (Colo.1996), and imposing a de facto fifty year cap on water planning efforts in Colorado—I respectfully concur in the result it reaches.

Under the anti-speculation doctrine, the "applicant must establish an intent to appropriate water for application to beneficial use," *id.* at 36, and "no appropriation of water . . . shall be held to occur when the proposed appropriation is based upon the *speculative sale or transfer of the appropriative rights to persons not parties to the proposed appropriation* . . . ." § 37–92–103(3)(a), C.R.S. (2007) (emphasis added). Such speculation may be evidenced by the fact that "[t]he purported appropriator of record does not have either a legally vested interest or a reasonable expectation of procuring such interest in the lands or facilities to be served by such appropriation, *unless such appropriator is a governmental agency* . . . ." § 37–92–103(3)(a)(I) (emphasis added). In *Bijou*, we held that while the statutory language does not entirely immunize governmental entities from speculation challenges, it does reflect the fact that "municipalities require sufficient flexibility within the anti-speculation doctrine to allow them to plan for future water needs." 926 P.2d at 38–39.

We recognized a similar flexibility with regard to the "can and will" requirement, section 37–92–305(9)(b), C.R.S. (2007), which is closely related to the anti-speculation doctrine. In *Bijou*, we concluded that in order to satisfy the "can and will" requirement, an applicant for a conditional decree must "establish that there is a substantial probability that within a reasonable time the facilities necessary to effect the appropriation can and will be completed with diligence, and that as a result waters will be applied to a beneficial use." 926 P.2d at 42–43. Thus, under the anti-speculation doctrine, the governmental entity must show that it intends to use the water to serve a growing population. Under the "can and will" requirement, the governmental entity must show that there is a substantial probability that it will actually be

able to build the water projects necessary to serve that growing population. *Id.* We concluded in *Bijou* that "the 'can and will' requirement should not be applied rigidly to prevent beneficial uses where an applicant otherwise satisfies the legal standard of establishing a nonspeculative intent to appropriate for a beneficial use." *Id.* at 43.

We have long recognized this need for flexibility in water planning by governmental entities. In *City & County of Denver v. Sheriff*, 105 Colo. 193, 202, 96 P.2d 836, 841 (1939), for example, we upheld a water plan by the City and County of Denver against a speculation challenge, noting that "it is not speculation but the highest prudence on the part of the city to obtain appropriations of water that will satisfy the needs resulting from a normal increase in population within a reasonable period of time." *See also* Amicus Curiae Brief of the City & County of Denver acting by and through its Board of Water Commissioners at 2 (urging us to preserve such flexibility because "it allows decisions about the most fundamental needs of citizens to be determined in a participatory process"); Amici Curiae Brief of the City of Colorado Springs and the Southwestern Water Conservation District at 7 (same).

The need for flexibility, of course, does not relieve a governmental entity from demonstrating that the conditional decree it seeks is non-speculative and meets the "can and will" requirement. *Bijou*, 926 P.2d at 38–43. In this case, the water court concluded that the conditional appropriation was non-speculative and met the "can and will" requirement, but made no findings to supports its conclusions. In my view, the solution to this lack of findings is a simple remand for entry of findings in accordance with the framework we set out in *Bijou*.

Instead, the majority instructs the water court on remand that our decision in *Bijou* "stands for a narrow construction." Maj. op. at 317. As part of that "narrow construction," the majority concludes that "[a]lthough the fifty year planning period we approved in *Bijou* is not a fixed upper limit, and each case depends on its own facts, the water court *should closely scrutinize a governmental agency's claim for a planning period that*

*exceeds fifty years." Id.* at 317 (emphasis added). This standard of "close scrutiny" imposes, in my view, a de facto fifty year cap on water planning in the state.

The majority's fifty year de facto cap is supported neither by the evidence adduced before the water court nor by *Bijou.* What a reasonable planning period would be in this case was not an issue fully developed in the water court, as the majority recognizes. Maj. op. at 318. And while we approved the plan in *Bijou* that used a fifty year planning horizon, we did not suggest that governmental entities could not adopt planning horizons in excess of fifty years. 926 P.2d at 40–42 (discussing the water court's ruling on the anti-speculation doctrine). The majority's transformation of *Bijou's* fifty year planning horizon into a de facto cap on water planning in Colorado is contrary to our longstanding recognition of the need for flexibility in this area.

At some point, it may be necessary for us to modify our decision in *Bijou.* But no one has urged us to do so here today. In my view, the better course of action would be to allow the water court, in the first instance, to consider this case in light of *Bijou,* and for us to later consider—or reconsider—the *Bijou* framework. Whether *Bijou* should be given a "narrow construction," maj. op. at 317, is an issue better left for another day. For this reason, I respectfully concur in the majority's judgment.

I am authorized to say that Justice RICE joins in this concurrence.